REDMANN, Judge.
A painting subcontractor and a manufacturer-supplier of paint appeal from a judgment which, on the theory that the paint application was improper and ruined the paint work, rejected their claims against the general contractor, its surety and the governmental owner of a newly-constructed building (and, as to the plaintiff supplier, its claim against the painter-subcontractor as well).
The paint work — application of a filler and then epoxy paint to interior concrete block walls — did fail. The filler and epoxy, bonded together, peeled “in sheets” as large as a foot square from about 50% of the building’s wall area. Appellants argue that the failure was caused by excessive moisture in the building at the time of painting. The painter at first refused to paint because of the moisture, but finally, under both oral and written protest, did paint because of the general contractor’s threat of suit for damages for delay in completion.
The testimony is unanimous that excessive moisture at the time of painting, including moisture immediately thereafter, can cause peeling. The painter testified that he only painted when the walls were themselves suitably dry (as measured with a moisture meter prior to applying filler, and as established by visual inspection pri- or to applying epoxy). He testified, however, “I know if you ain’t got a watertight building you shouldn’t start [to paint].” The building was far from watertight at the painting time which the general contractor forced upon the painter; there was even standing water on the floors.
Against this unanimity of testimony that substantial moisture was present and that moisture can cause peeling, defendant general contractor presented a chemical engineer’s testimony that the cause of this particular peeling was definitely not moisture, but rather a too thick application of the filler (up to 30 mils thick). The filler “is not made to bond on surfaces like concrete or block;” “you are required to remove the excess ... by means of a squeegee. This then fills the voids [in the concrete block surface] and permits an area of concrete exposure where your epoxy can bond to the [concrete] block in satisfactory manner so it won’t peel.” The trial judge accepted this explanation of the cause of peeling, and attributed the improper application to both the painter and the manufacturer-supplier who had demonstrated (and periodically supervised) the application.
The chemical engineer testified that proper application of filler requires use of a squeegee “just like you clean windows.” “[I]f you want to do the job right it [use of a squeegee] should have been in the specifications.”
Use of a squeegee was not in the architect’s specifications, which called for application by brush, roller or spray in accordance with the manufacturer’s directions. Thus the architect (who did not testify) apparently disagreed with the chemical engineer. Furthermore, the painter had been in the painting business for 20 years, applying block filler. Finally the paint manufacturer’s directions, as provided by the representative who demonstrated the application of this particular filler to the painter, did not call for use of a squeegee. Although the chemical engineer’s theory of cause is internally consistent, these three practical authorities require rejection of his theoretical opinion that the use of a squeegee is the proper method of application of filler. (We therefore do not consider whether R.S. 9:2771 would protect the painter against liability because of failure of the specifications to specify squeegeeing.) Rejecting the squeegee requirement leaves the too-thick-application theory a less plausible explanation of the peeling than the excessive moisture theory.
The trial judge would alternatively have rejected the painter’s and supplier’s claims because (the chemical engineer testified) *474 there was excessive moisture between the filler and the epoxy (though not between filler and concrete block), indicating that the painter, with the supplier’s supervision, had applied the epoxy to wet filler. We note, however, that the testimony is that the epoxy and filler were well-bonded together, and came off the wall together in all instances. Any application of epoxy to wet filler (on dry concrete) is nowhere explained as a cause of the .concrete-filler separation. (The moisture theory is that wet concrete prevents a bond of most paint-like substances, even when the wetness occurs immediately after painting from humidity which at night condenses inside the hollow concrete block and penetrates its porous material.)
In our opinion, the painter established a prima facie case by the evidence of moisture in fact and moisture as possible cause of his work’s failure, and by the evidence of his being forced by the general contractor to paint under moist conditions over his protest. After this showing, it was the general contractor’s burden to go forward with evidence to rebut the case fairly established by the painter. The general contractor’s theoretical explanation does not carry this burden, because it is effectively contradicted by the experienced painter, the paint manufacturer and the architect, and because it would require a performance by the painter not specified in the contract itself. The obvious explanation of this paint work’s failure—the massive amount of moisture in an incomplete building with a badly leaking roof— has not been rebutted.
The paint manufacturer-supplier is similarly not chargeable with the failure of the paint work. The supplier was not in a position to refuse to supply, or to oblige the painter to rebuff the general contractor and await the building’s watertightness before painting.
We do not consider whether the governmental owner might otherwise be liable; it is not liable because there is no allegation of defect in the contractor’s bond, R.S. 38:2244.
The painter and supplier have properly abandoned their demands for 10% attorney’s fees under R.S. 38:2246, because they no longer claim the “full amount” of their recorded or sworn claim. The supplier still seeks the cost of filing and attorney’s fee for preparing its lien; however, this remedy is available only under the private building contract law, R.S. 9:4801A. The public works law provides the ordinarily greater remedy of 10% attorney’s fees, but only if the “full amount” of the claim is recovered.
The judgment appealed from is reversed (except insofar as it awarded Napko an unrelated account balance). There is judgment for Marshall-Koehl, Inc. for $10,242.-50 with interest from judicial demand as prayed and all costs, against Fremin-Smith Service, Inc. and Great American Insurance Company of New York, New York, in solido; and there is judgment for Napko Corporation (in addition to that rendered by the trial court) for $5,315.28 with interest from judicial demand and for all costs, against Marshall-Koehl, Fremin-Smith and Great American in solido, with any execution by Napko against the latter two to be credited against the judgment in favor of Marshall-Koehl.
Reversed.